Mr. Padmanabhan. Mr. Padmanabhan. Thank you, Your Honor. May it please the Court. Your Honors, before I discuss each issue in detail, here's a brief overview of why this Court should reverse the District Court. First, J.V. & Sons has a breach of contract claim based on an implied contract. The terms of such a contract is a question of fact that must— At least granted relief on alternative grounds. Your Honor, there is no—you can look at the record. The District Court did not expressly find an express contract. There is no express contract in this case. What they're trying to cobble together are rate sheets and e-mail communications to basically pull together what they view are the terms of the contract. It is purely an implied contract. Let me start with this issue because I was going to start here anyway. You ask on page, I think, 52 of your brief that we reverse the Court's order in its entirety. That includes this contract case claim. Yes, Your Honor. Which is a complete—you know, we got claim and counterclaim. And the District Court ruled—or your challenge to the contract claim is that the contract found by the Court did not exist. And if we disagree with you on that, as I understand it, there is no other contract issue. You do not—you do not present as an issue that either the eight claims were not unpaid or the amounts were wrong and so forth. Am I right about that? That's correct, Your Honor. So at that point, the—if we reject your existence argument, then that claim is a final judgment. Yes, Your Honor. And if we—and so it doesn't matter what we do with the other issues, which are more— Legal. —more complicated. More complicated, yes, Your Honor. But even if we were manned on that, we would be affirming a final judgment. Yes, on this issue. Then we're on the same page. Yes, thank you. I'm going to go back to my question about the contract claim, and I'm going to try to answer it in a different way than I did in this case. So—but in terms of the contract claim, there is no express contract. What there is is an implied contract. Do you want a napkin, Your Honor? There is an implied contract. And what the Court did that was incorrect was it usurped the jury's role in finding the terms of this implied contract. Now, the second issue— That would be an issue of law under Minnesota law. I'm sorry? Existence of a contract. Existence of a contract is a question of law, but the underlying facts for what are the terms of the contract is a question of fact. And so here, what the judge did— Yes, but there's no dispute as to the terms. We just agreed with that. No, I don't believe so, Your Honor. There is a dispute as to the terms. I know what you're saying. You're saying what was, you know, what was a complete contract and so forth. Yes. So there are some terms that we can say, yes, there are rate cheats. The problem— What was the jury issue on the contract? So the jury issue on the contract claim is what are the very terms of this contract. So what are the rate cheats that control? What are the—are there actually communications that actually show a meeting of the minds? What is the role of the quick pay agreement in this agreement? And what's your best Texas case that those, what I would call introductory issues are for a jury? So I believe the Diamond case is the best case on point on that. Okay. But also, Your Honor, because there's no express contract and the terms of the contract are a question of fact, let me stay on this for one second. If you look at the court's order on this issue, what they rely on are rate cheats. But if you look at even the appendix at page 380 and I think 385, those are the same rate cheats. But on one of them, you'll see that JV and Sons has handwritten rates on there. But they're not signed by both parties. If you look at the, an example of a communication, I believe it's appendix like 385 or maybe I'll get the number for you. But one of the e-mails, you can see it specifically goes to looking at the proposals made by JV and Sons and asking, hey, will we agree with that proposal or not? Again, these are all questions for a jury to look at, look at the entire context of the relationship. But that's not the whole inquiry on implied contract. But it goes to the fundamental inquiry of implied contract, which is what are the terms the parties actually had a meeting of the minds on? But performance can establish what those terms were. So if one looks at how the contract was performed while it was being complied with, and then you say that, well, that's consistent with the rate sheets, that's consistent with the communications that took place by e-mail, doesn't that in fact establish the terms of the contract? And at that point, doesn't the burden lie on you to show where the question of fact exists as to those terms? It does, Your Honor. And so let me explain why the course of conduct still raises fact issues. So under the course of conduct, what you have is, other than the very first invoice, asset, I mean, JV and Sons factored every single invoice under the quick pay agreement.  Well, counsel, let me ask you about that. You mentioned that the role of the quick pay agreement was something maybe the jury should consider in terms of what were the terms of this contract. But as I read the quick pay agreement, it provides on its face that it pertains to the purchase of accounts receivable by AVL from JV. Does that even apply to the hauling of crude? Yes, it does in this case, Your Honor, because what JV and Sons specifically said, and it's the context of what the jury needs to look at, is JV and Sons said, we cannot haul for you unless we have a factoring agreement. We need to get paid earlier. And so part of the relationship, JV and Sons could not have performed its hauling services if they could not have a mechanism by which they got paid earlier. But what does that have to do with the purchase of accounts receivable? Your briefs indicate that AVL is paying JV directly for this hauling service. I'm sorry? So the briefs indicate, and I think the briefs indicate that the payment is directly from AVL to JV. There is no third party paying JV. The reason... Why is it the purchase of an account receivable? The reason that the brief suggests that AssetVision is directly paving JV and Sons is because of the quick pay agreement. Otherwise, the normal standard practice was that JV and Sons would have to wait until AssetVision's customer paid JV, paid AssetVision. And then from that money, AssetVision would pay JV and Sons. I understand that, but it's still a direct payment. But the main reason for that payment is the quick pay agreement, which has additional terms imposed on that relationship. And, in fact, there's testimony to that effect from Mr. Hallwile for the jury to consider. How is that the purchase of an account receivable, which is what the quick payment agreement covers? And that's the mechanism. The purchase of the assignment of the invoice is the security, is the mechanism by which JV and Sons got paid earlier. That is the mechanism used. But it's those terms. It's the very heart of this agreement, and it's the standard practice. It's because of that agreement that JV and Sons was able to provide this service. Where is the standard of practice in the summary judgment record? Where is the standard? Oh, what you just referred to. So it's the standard practice is just basically, if you look at the record itself, Your Honor, what they point to is they got paid on the first 350 hauls. That's what JV and Sons. I thought you were referring to the industry. There's all kinds of references to this is the way they do it in the Texas oil country. Oh, no, I wasn't referring to the industry, Your Honor. This is very specific. These facts that I'm giving you are. This is the course of dealings for these parties. The course of dealings for these parties. And the course of dealings for these parties included the quick pay agreement. Moreover, I mean, just in terms of the contract terms itself and in the conduct, for each of these invoices that were actually factored and paid, there was disputes with each one, and every one of those was negotiated. And the reason I bring that up is, again, the course of conduct goes to not a set of terms, but rather a constant dispute between the parties about what needed to get paid, what did not need to get paid, and then they would get that paid. There's not a set terms that everybody agreed upon. So your claim is essentially that the course of conduct is not sufficient to establish the terms of the contract because the contract was in a constant state of flux in negotiation. That's correct, Your Honor. To go one step further, the course of conduct must include, or the jury must at least have to consider the role of the quick pay agreement in it, given its central role in JV and Sons being able to even have a relationship with Asset Vision and the role it played in the actual transaction of how JV and Sons got paid during the term on the invoices that it did get paid on. And so for those reasons, there is a fact issue on the actual terms of the agreement. Also, if you look at the district court's analysis on this issue, and we go through this in our brief in detail, there's no rate sheet that's signed, and I gave you that distinction, but if you look at the communications, even if you look at the citation to our answer in the Texas court, the district court cites the first half saying we've agreed to rate sheets, and the second half of that very same statement that says we don't think the rate sheets are the single term in this contract, and it at least includes the quick pay agreement where it's to that effect. And the reason I bring that up is, in the district court's own order, by not addressing the rest of what Asset Vision has said in the pleading, it shows the fact issue that's there. Asset Vision truly believes that the terms of the contract are beyond the rate sheets. JV and Sons is going with just the rate sheets. That is an issue for the jury to decide on what are the terms of this agreement. With that, let me go. Your Honor, I'll reserve the balance of my time for rebuttal. You're not going to reach the? I'll go ahead and reach it. Well, no, then counsel shouldn't talk about it. Oh, no, I'll reach. I'll do the second. You can't talk about rebuttal. Okay. Let me ask you this, counsel. What confidential information does Asset Vision allege that was disclosed here? So the confidential information is twofold, Your Honor. It's PIN codes, which are very customer-specific, site-specific information that the driver needs to be able to access the site location. And it's also safety information that Asset Vision then summarizes for the driver in a so that they can access the site correctly. So those are the pieces of information. The Baker case is a very good example of why those type of pieces of information are confidential. And DELEC provided this to your client? DELEC provided it to our client, and then our client then provided it to the driver. And that's why we don't believe the Non-Compete Act should have been used to decide the non-compete provision. But more importantly, the district court never addressed the argument that Texas recognizes goodwill as an interest, and the non-compete provision enforces the return promise. The district court didn't have to say that. The district court, but it's an actual reason, and the district court never addressed it. And that's in the record, and that's a basis on which you can find, or a jury could find, that there is, for a non-solicitation provision, enforces a return promise, which in this case is the non-disclosure agreement. Does Texas allow the enforcement of a general provision of goodwill, or do they limit it to the sale of goodwill in the context of a business? Texas, I believe under Marsh, Your Honor, allows for goodwill to be a protectable interest. And in terms of sale, I can only answer it in the context of trademarks, Your Honor, that it allows for the sale of goodwill as part of the trademark transaction. I don't know more generally than that. And then lastly, on the non-disclosure agreement, Your Honor, Texas law is very clear. There are no prerequisites. You can look at the ZEP case for that. But more importantly, if you look at the district court's analysis, all of the cases the district court relies upon, none of them found the non-disclosure agreement to be unenforceable. And in fact, all of them enforce the non-disclosure agreement at some level in a preliminary injunction context. Unless you have other questions, that's all I have. Mr. Gliegel. Good morning, Your Honors. May it please the Court, counsel. The issue I have with counsel's analysis of the contract claim is this. If you look at the appendix at pages 377 to 382. You have to speak up. I'm sorry. If you look at the appendix at pages 377 to 382, the rate sheets are there. The argument that's been advanced by AVL's counsel seems to be that there was a rate. There's one rate that doesn't. Still can't hear you. There was a rate. One rate does not form a contract, and therefore, the district court was mistaken with respect to the contract formation. But if you look at the actual rate sheet agreements, and there were three covering different time periods in different locations throughout the state, there are specific rates not only for mileage, but the minimum amount of oil barrels to be hauled, the reject rate charges, et cetera. And I think in their efforts to convince this court to overturn Judgment Nendez's summary judgment on the contract claim, they have overstated what occurred. The district court properly found that you had not only the rate sheet agreements, but  you had a course of conduct whereby the invoices were submitted to AVL. And tellingly, Mr. Hallwell, the sole LLC member, has admitted repeatedly on the record that the money was owed. Well, if there was no contract, why would AVL admit that this money was owed? Pursuant to the Where is that in the record? It's probably in your brief. It is in my brief, Your Honor. In the court The deposition testimony? Yes. There's a cite to that. And really what counsel is pointing to is this. JVS, my client, would submit an invoice to AVL with respect to the rate sheets. Like any invoice, and on these invoices, there were a number of these amounts that were charged pursuant to the rate sheets. And what the record showed was that there might be a disagreement, for example, and this was the big one on the record, and I don't have this cite, Your Honor, was wait times. You charged, my client charged AVL for X minutes or X hours of wait time. And AVL took issue with that one line item on an invoice. That's what was the subject of discussion. Not whether or not there was a contract. Not whether or not there was a dispute as to the terms of the contract. And I'm going to repeat myself again. Not whether or not those invoices, once those specific line items had been addressed, was payable, was a valid invoice pursuant to the agreement, was payable by AVL to JVS. And I'm perplexed by the argument with respect to the contract given this record. Now, if the Court doesn't have any questions, Your Honor had asked what the confidential information was. Let me ask a more general question. Yes, Your Honor. The district court treated the nondisclosure clause effectively as a covenant not to compete. Yes. That's probably the most novel part of this case. Can you address why it should be treated as a covenant not to compete and then also what information is alleged to have been disclosed? Happily. The district court properly treated the nondisclosure, the confidentiality provision as a covenant not to compete given the incredible breadth of that provision. The nondisclosure agreement, if I may read it because to highlight the overbreadth of this provision, is it says not to disclose any confidential information to any other person or use any confidential information, et cetera. This is the key. The agreement itself purports to define confidential information as, quote, all or made available to seller, in this case, my client, J.B. and Son's Trucking, directly or indirectly through any means of communication, including seller's observations by virtue of opportunities provided to seller by purchaser. In a nutshell, anything my client allegedly learned while it was hauling oil for prior to any relationship with AVL is defined by the agreement as confidential. Function. Texas law have a blue pencil, Doctor? I don't believe so, Your Honor. I mean, AVL hasn't argued it. Well, but that's how you pare down overbroad covenants in some states. That is true, Your Honor. I don't know how you would. That's not, nobody looked at that here? Nobody looked at that. There was no argument by AVL that the Court had the opportunity to blue pencil this confidentiality provision. And with all due respect to the Court, given the breadth of this provision, I don't know how a district court could blue pencil this provision. But to get back to your question, Your Honor, what is purportedly defined as confidential information essentially is a non-compete. Anything my client learned, whether it was in documents, whether it was truly observed it. Let me give you an example. Under this definition, if one of my client's drivers went from point A to point B to pick up oil, that route that that driver determined to take would be under this provision an observation that was learned while hauling oil for Dellek through AVL. And therefore, under this provision, would be treated as confidential information by AVL. So that's why the Court properly applied the analysis under Texas law that this was a, functionally, was a non-compete. Now, if we then turn to a significant part of the lower court's decision as to whether or not the non-solicitation provision was reasonably related to a, was related to a reasonable protectable interest, we need to take a look at what AVL argued. AVL argued that the non-solicitation provision was related to a reasonable restriction, the restriction being the confidentiality provision. They've argued we needed the non-solicitation provision to maintain the confidentiality of this overbroad provision in the quick pay agreement. But what the district court properly looked at was that my client, JV and Sons Trucking, had hauled for Dellek through AVL for two months prior to ever signing the quick pay agreement. Now, if AVL was fine with my client hauling oil for Dellek two months prior to signing the quick pay agreement on which AVL hangs its hat with respect to the restrictive covenants, then it defies logic and common sense that the quick pay agreement was necessary for a reasonable restriction, apart from the unreasonableness of the restrictions themselves. Does the quick pay agreement even apply outside the context of the purchase of receivables? District court found that it did. I question whether it does, Your Honor. We argued below, and the district court did not accept this argument. As Your Honor had observed, that quick pay agreement, its subject matter, its object are my client's invoices to AVL. AVL is factoring its own invoices. That's what that quick pay agreement does. Say that again. The use of the word factor is not in the briefs. It's in the district court's opinion, and it doesn't relate to my understanding of that word in other contexts. Well, it doesn't because I understand why you're saying that, Your Honor, because generally you wouldn't have a company like AVL factoring its own invoices. So let's just refer to it as a quick pay agreement. I can't. You just have to speak. I'm sorry, Your Honor. It's my age. I have, other than this situation, it's not your typical factoring arrangement, where if I am a merchant and I need money to run my business, I go out and find a factoring agent, and then I sell them my receivables. Here, AVL is in essence purchasing its payables for a 3 percent discount. And that is the object of the quick pay agreement. It states it on the first page of the quick pay agreement. It refers to the purchase and sale of those receivables, those invoices. So I question, and I do, Your Honor, whether or not the quick pay agreement has any reference to the hauling arrangement. There are two separate commercial relationships. On the one hand, you're hauling oil, pursuant to the rate agreements, et cetera. On the other hand, my client is selling, if you will, its invoices. Well, payment terms are terms of a contract. They are. The QPA deals with the one aspect of the payment terms for future transactions, doesn't it? If my client chooses to avail itself of the quick pay agreement with respect to any particular invoice. Yeah, and if Asset Vision chooses to use your client as the hauler. Well, I... There's, you know, it's free enterprise on both sides. No, there is. And I would make a friendly amendment to that. And again, I go back to the fact that for two months prior to the parties signing the quick pay agreement, my client was hauling Fridelic through AVL, and AVL paid on those invoices. And again, I take issue with counsel that my client... You wanted, your client wanted different payment terms, and Asset Vision imposed some conditions and restrictions on that. With respect to the payment, I agree. Well, in an agreement that included other terms. With respect to the payments, yes. And then there was the non-solicitation and the confidentiality provision in the quick pay agreement. Every other provision... If there had been a written contract to begin with, there would have been those terms, probably. Unless your client had refused to sign it. If there had been another written agreement with respect to payment and payment in net 15 or net 30 or what have you, yes. The record reflects that originally my client was paid on a net 15. And then it was told, we're not going to pay you on a net 15 anymore. You're going to have to wait. But if you want to get paid earlier, here's a quick pay agreement. So yes, I agree with that. I do. Well, if there had been a written contract that said net 15, then your client would have had a stronger position. With respect to... They just said, that term is not going to apply in the future. And there's no written agreement. So now the bargaining resumes. With respect to the payment term, yes. No, with respect to the relationship, which included payment terms. I'm having trouble following that, Your Honor. Well, I'm having trouble with the way that both sides have dissected the course of dealings here into convenient legal arguments. If I may be... Let me ask you a question, because I think... Yes, Your Honor. With Judge Loken saying, I'm now a little bit confused. And the question really is this. Is that if an agreement is indefinite as to the terms of payment, is the agreement otherwise enforceable as a contract to haul oil? My position would be, yes, it is. Because the timing of payment would be a reasonable amount of time. And if there was no term, then we could do, as we learned in law school, a gap filler. We'd look at the industry as to what's reasonable. You'd bring an unjust enrichment lawsuit if you had to. Well, that's true. That's true. But as far as contract law, you'd be looking to imply a term of reasonable time for performance and a reasonable price for hauling. Is that really a contract at that point? Or is it a series of contracts being negotiated over and over again? No, my position would be in this situation, because everything was in the rate agreements. The amount of charges were in the rate agreements. We're focusing only on the timing of payment. And whether or not, when a payment is due for services that have been rendered pursuant to agreed-upon rates, it would be a reasonable period of time. In other words, a gap filler. That would be what I would presume would be the law. That's what would apply in this situation, but for the quick pay agreement. Does that answer your question? It does. Okay. If your honors have no further questions, I know I've got 28 seconds. I don't need to say anything more. Thank you for your time. Thank you. Mr. Padmanabhan, I have a quick question. And it's about the covenant not to compete being implied in the solicitation agreement and MARSH. And MARSH reflects a citation to 15.50 of the business code. And in 15.50 subdivision A, it talks about covenants not to compete have to be part of an otherwise enforceable agreement that it has to have reasonable limitations as to time, geographical area, and the scope of activity to be restrained that are reasonable and do not impose a greater restraint than necessary to protect the goodwill. And so the issue at this point is if we're inferring out of the non-solicitation agreement the covenant not to compete, where do we find the terms that are necessary? That is, the limitation as to time, geographical area, and scope of activity. Your honor, so in terms of time, the contract is for . . . Sorry. I just had it in my . . . Let me start with geographic scope first. So the way the non-solicitation provision works is you can't solicit people that we've introduced you to are our clients. And what that effectively does is it limits them to five clients. And that's why it's a very limited scope of non-solicitation. And basically, it's parts of Texas that I think what it comes out to. And so the geographic limitation is inherent in the five clients, right? You look at where they're doing business, those are the geographic bounds. Yeah. And the time period, the contract is for, I think, it expires 180 days after termination. So I don't know that there's a long-term . . . In terms of a problem with the contract, it was really the scope of it. And the scope of it really just comes down to these five people. And you don't . . . And if you don't solicit those five or six clients, I think it's five or six in the record, that's all there is to it. Thank you. Is there anything else, Your Honor? I think I'm out of time. No, thank you. Thank you. The case has been thoroughly briefed. Arguments have been helpful. It's not an easy case to sort out. We will take it under advisement and do our best with it.